**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

KATIA BORGELLA and ANTHONY WILLIAMS,

   Plaintiff,

v.

ROBINS & MORTON CORPORATION and
ROBINS & MORTON GROUP,

   Defendants,
_____

CASE NO.: 1:21-CV-22789-JLK

*Plaintiff Demands a Trial by Jury*

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiffs, KATIA BORGELLA and ANTHONY WILLIAMS (hereinafter referred to as "**Plaintiff**" and/or "**Borgella**" and "**Williams**"), by and through their undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendants' Robins & Morton Corporation and Robins & Morton Group (hereinafter referred to as "**Defendant**" and/or "**Robins**"), and alleges as follows:

**INTRODUCTION**

1. This employment discrimination case is about an employer who subjected its Black employees, who identifies as a Black individuals to relentless harassment and discrimination.

2. Plaintiffs' bring this action pursuant to 42 U.S.C. § 1981 ("**Section 1981**") and 29 U.S.C. § 2612 ("**FMLA**").

3. Plaintiffs seek monetary relief to redress the Defendant's unlawful employment practices in violation of Section 1981 and FMLA. Additionally, this action seeks to redress Defendant's deprivation of Plaintiff's personal dignity and their civil right to pursue equal employment opportunities.

4.	At bottom, the Defendant is liable for subjecting Plaintiffs' to a work environment rife with relentless race discrimination and national origin discrimination.

## PARTIES

5.	At all material times, the Plaintiffs, KATIA BORGELLA and ANTHONY WILLIAMS identify as Black. Plaintiffs are residents of the State of Florida, in Miami-Dade County.

6.	At all times material, the Defendants, Robins & Morton Corporation and Robins & Morton Group was/is a for profit entity existing by the virtues and laws of the State of Florida.

7.	At all times material to this action, Plaintiffs were employed by Defendant.

8.	The exact number of employees at the above entity is unknown, but upon information and belief, the number of employees is well above the statutory minimum.

## JURISDICTION AND VENUE

9.	This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.  This action is authorized and instituted pursuant to 42 U.S.C. § 1981 and 29 U.S.C. § 2612.

10.	Venue is proper in this Court under 28 U.S.C. §1391 because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Southern District of Florida.  The Defendant is located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## STATEMENT OF MATERIAL FACTS

### [*Katia Borgella*]

11. On a daily basis, Defendant's employees referred to Plaintiffs' and other Black employees as "**NIGGAS**" and/or "**MY NIGGA**".

12. On or about January 17, 2018, Plaintiff Borgella began working for Defendant as a Gatekeeper. In or around 2019, Plaintiff Borgella was promoted, in title alone, to Labor Foreman. Plaintiff Borgella was not given the salary increased as promised when she received this 2019 promotion.

13. At all material times, Defendant considered Plaintiff Borgella to be an exemplary employee as a Labor Foreman.

14. At all material times, Plaintiff Borgella was qualified for her position based on her education and work experience.

15. At all material times, Plaintiff Borgella was treated differently from Defendant's other employees based on her race and national origin.

16. At all material times, Defendant treated Plaintiff Borgella less favorably than other similarly situated foremen, supervisors and managers working for Defendant.

17. At all material times, Ms. MERLIN (Last Name Unknown) (hereinafter referred to as "**MERLIN**") was one of Defendant's employees. At all times relevant to this action, MERLIN identified as Hispanic.

18. In or around May 2020, Defendant assigned its African American workers significantly more rigorous assignments, than its non-black, non-African American workers.

19. In or around May 2020, Plaintiff Borgella reported such discriminatory comments and conduct to Defendant's Superintendent, Mr. ANTHONY LAMB (hereinafter referred to as "**LAMB**").

20. In or around May 2020, Plaintiff Borgella reported such discriminatory comments and conduct to Defendant's Superintendent, Mr. CELVIN (Last Name Unknown) (hereinafter referred to as "**CELVIN**").

21. At all relevant times to this action, Mr. FRANCO APPOINTE (hereinafter referred to as "**FRANCO**"), was Defendant's General Foreman and held direct supervisory authority over Mr. Williams and controlled the terms and conditions of Plaintiff Borgella employment.

22. At all relevant times to this action, Mr. RICK FISHER (hereinafter referred to as "**FISHER**"), was Defendant's Senior Superintendent and held supervisory authority over Plaintiff Borgella, controlling the terms and conditions of Plaintiff Borgella's employment.

23. At all times relevant to this action, Plaintiff Borgella put Fisher on notice of the discriminatory comments and conduct. FISHER claimed to not have any knowledge of discriminatory comments or conduct despite the complaints.

24. In or around June 2020, MERLIN referred to Plaintiff Borgella as a "**NIGGER BITCH**."

25. Plaintiff Borgella complained to Defendant about the racially discriminatory comment, specifically, being referred to as a "**NIGGER BITCH**" by MERLIN.

26. On numerous occasions, MERLIN contunied to refer to Plaintiff Borgella as a "**NIGGER BITCH.**"

27. Again, Plaintiff Borgella complained to Defendant and FISHER, LAMB, CELVIN about the racially discriminatory comments and conduct, specifically, being referred to as a "**NIGGER BITCH**" by MERLIN.

28. At all material times, Africa-American employees were referred to as "**NIGGAS**" by Defendant's employees.

29. Defendant on numerous occasions, ignored COVID-19 safety protocols and did not sanitize equipment as needed.

30. Plaintiff Borgella witnessed a number of employees not wearing their masks nor sanitizing their equipment after usage.

31. Defendant's Employees were forced to use heavy machinery when COVID-19 exposures were made aware in the company and would not disinfect and sanitize said equipment before usage.

32. In or around July 2020, Plaintiff Borgella contracted COVID-19 from a coworker.

33. In or around July 2020, Plaintiff Borgella was asked to test herself and was informed she would be reimbursed for the $100.00 test. Plaintiff Borgella took the test as directed, however she was. not reimbursed. Initially, Plaintiff Borgella tested negative.

34. However, Plaintiff Borgella COVID-19 symptoms persisted. As such, Plaintiff Borgella advised FRANCO and CELVIN that although the test came out negative, she would be going to the emergency room for confirmation of her COVID-19 status.

35. At this time, Plaintiff Borgella was an eligible employee and entitled to take leave under the FMLA.

36. Plaintiff Borgella visited the emergency room where she was tested for COVID-19 and Plaintiff Borgella COVID-19 test came back positive.

37. As a result of the positive test result, Defendant notified Plaintiff Borgella that as a result of the positive test, Plaintiff Borgella was to quarantine until she tested negative and then only at that point would she be cleared to return to work.

38. Throughout her mandated quarantine, Plaintiff Borgella remained in constant communication with Defendant and its employees by way of text messages, phone calls and electronic messages to Defendant's corporate office, CELVIN and FRANCO.

39. In or around September 2020, after several COVID-19 tests, Plaintiff Borgella tested Negative.

40. Plaintiff Borgella then contacted FRANCO and CELVIN and advised them of the negative test results.

41. Prior to Plaintiff Borgella's complaints to Defendant about the racial discrimination, Plaintiff

Borgella had not been disciplined or counseled about her job performance.

42. On or around September 16, 2020, Defendant unlawfully terminated Plaintiff Borgella based on her race and her opposition of the Defendant's discriminatory conduct and in violation of the FMLA.

43. Defendant's solution to curing the harassment and discrimination being suffered by Plaintiff Borgella is to termination of her employment.

44. At all times relevant to this action, Defendant and its leadership team were aware of Plaintiff Borgella complaints of racial discrimination.

[*Anthony Williams*]

45. At all relevant times to this action, Mr. FRANCO APPOINTE (hereinafter referred to as "**FRANCO**"), was Defendant's General Foreman and held direct supervisory authority over Plaintiff Williams' and controlled the terms and conditions of his employment.

46. At all relevant times to this action, Mr. ANTHONY LAMB (hereinafter referred to as "**LAMB**"), held supervisory authority over Mr. Williams, controlling the terms and conditions of Plaintiff Williams' employment.

47. At all relevant times to this action, Mr. RICK FISHER (hereinafter referred to as "**FISHER**"), was Defendant's Senior Superintendent and held supervisory authority over Plaintiff Williams, controlling the terms and conditions of Plaintiff Williams' employment.

48. At all relevant times to this action, Mr. CELVIN (Last Name Unknown) (hereinafter referred to as "**CELVIN**") and held supervisory authority over Mr. Williams, controlling the terms and conditions of Plaintiff Williams' employment.

49. Although Plaintiff Williams was originally hired as a Gate Keeper, he was assigned additional duties that were usually assigned to Defendant's Laborers. Over the course of his employment Plaintiff Williams was promoted to a Laborer.

50. At all relevant times to this action, Plaintiff Williams was qualified for his position based on his education and work experience.

51. On numerous occasions, Defendant's managers made racially discriminatory statements to Plaintiff Williams such as, "**WHAT'S UP MY NIGGER**?"

52. FRANCO, who is Hispanic, would constantly play rap music and specifically shout out the lyric/word "**NIGGER/NIGGA**" loudly while Plaintiff Williams was present. It became an everyday usage of the derogatory phrase when Franco would enter the lunchroom and saw Plaintiff Williams.

53. On other occasions, Defendant's FRANCO's prejudice towards Plaintiff Williams' race was more obvious: "**HE [Plaintiff Williams] DOESN'T HAVE A PHONE, BUT YOU CAN CALL HIM ON HIS SECTION 8 HOUSING PHONE**".

54. Plaintiff Williams did not have any form of Section 8 Housing at the time of his employment with Defendant and simply shared a cell phone with his girlfriend.

55. FRANCO would also call over Plaintiff Williams at times by shouting out "**HEY BOY**".

56. On a separate occasion, Plaintiff Williams was putting up a fence with his other African American co-workers and noticed FRANCO and CELVIN in a golfcart laughing at their direction while appearing to take photos and record them.

57. It was later discovered that FRANCO and CELVIN had begun a group chat and sent out a photo of Plaintiff Williams and the other Black coworkers working on the fence with

photoshopped police officers with their guns drawn behind them and a quote stating "**FREEZE!**"

58. On numerous occasions, FRANCO informed Plaintiff Williams that "**YA'LL WILL ALWAYS BE LABORERS CLEANING SHIT**," referring to laborers who were also African-American.

59. Plaintiff Williams' girlfriend, Ms. Katia Borgella (hereinafter "**Ms. Borgella**"), who also works for Defendant as a Laborer experienced racial discrimination by Defendant's employees as well. By way of example: a coworker by the name of CELVIN, called Ms. Borgella a "**NIGGER BITCH**" during a discussion they had. Ms. Borgella immediately complained, and her complaints were not taken seriously. CELVIN was not reprimanded, and no corrective course of action was taken by Defendant.

60. Non-Black employees have extensive privileges unlike Plaintiff Williams and Ms. Borgella. Black employees were worked harder and assigned heavier tasks without help and were also not given the correct equipment unlike the Hispanic workers.

61. Plaintiff Williams complained numerous times to Defendant's employees/supervisors about the racial discrimination and disparities within the company.

62. On numerous occasions, Plaintiff Williams witnessed FRANCO to be under the influence of alcohol and drugs while on the job.

63. By way of example, on a specific instance, FRANCO picked up Mr. Williams while intoxicated to conduct a job on Franco's Sister-In-Law's house. FRANCO instructed Plaintiff Williams to drive the truck. FRANCO remained in the vehicle and slept as Plaintiff Williams worked.

64. On other occasions, FRANCO would demand that Mr. Williams to take him to the liquor store to purchase and drink alcohol while on the job.

65. Plaintiff Williams would be given strenuous and heavy-duty tasks that were meant for a team of individuals to complete but would be forced to complete the work on his own in a short span of time.

66. For example, Plaintiff Williams was tasked with cutting concrete slabs, conducting grout filling, installing door frames, bed grading, install access panels, install dry wall, guard rails, operate night shift machinery, clean up the job site, additional laborer tasks, etc. all on his own.

67. Plaintiff Williams would ask multiple times for additional help or back up from FRANCO and CELVIN. However, they would simply ignore Mr. Williams Requests. CELVIN called Mr. Williams a "**PUSSY**" for asking for the help he needed.

68. Many times, Mr. Williams complained to FRANCO and CELVIN concerning the dangerous and hazardous conditions in which he was forced to work in.

69. Mr. Williams had to purchase his own safety gear, which included gloves, eyewear, drill, etc. He was never reimbursed for the equipment while other non-black employees had access to the proper safety gear needed for the job duties provided by Defendant.

70. Defendant, on numerous occasions, ignored COVID-19 safety protocols and did not sanitize equipment as needed.

71. Defendant's employees were forced to use heavy machinery without the equipment being properly sanitized and without protective gear.

72. On or about July, 2020, Plaintiff Williams contracted COVID-19 from a coworker.

73. Before knowing he was infected with the virus, he was asked to test himself and he was told he would be reimbursed for the $100.00 test, which he never was reimbursed. He tested negative at the location in which Defendant sent him to.

74. However, Mr. Williams was coughing, had fever, shakes and was feeling extremely ill. As such, he advised Franco that although the test came out negative that he would be going to the emergency room because he believed he had COVID-19.

75. FRANCO's responses were that he needed Plaintiff Williams at work because work had to be done and he was very upset that Plaintiff Williams' felt ill and needed to go to the hospital.

76. Upon arrival at the emergency room and awaiting the results, he was found to be positive with COVID-19.

77. Mr. Williams was asked to quarantine until he tested negative and was able to return to work.

78. Throughout Mr. William's entire quarantine, he remained in contact with Defendant and would do so via text messages, phone calls and e-mails to Defendant's corporate office, CELVIN and Franco.

79. On or around September 2020, after several COVID-19 tests, Mr. Williams tested Negative.

80. Mr. Williams then contacted FRANCO and CELVIN and advised them of the negative test results.

81. Prior to Mr. William's complaints to Defendant about the racial discrimination, Mr. Williams had never been disciplined or counseled about his job performance.

82. On or around September 16, 2020, Defendant unlawfully terminated Plaintiff Williams based on his race and his opposition of the Defendant's discriminatory conduct.

**COUNT ONE**
*Race Discrimination (Discrete Act)*
*in Violation of* **§ 1981**

10

83. The Plaintiffs reincorporate the factual allegations in the previous paragraphs 11-82.

84. This is an action for discrimination and harassment because of the Plaintiffs' race in violation of Section 1981. 42 U.S.C. §1981 states in relevant part as follows:

> (a) Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
> (b) "Make and enforce contracts" defined For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. §1981.

85. The Plaintiffs, are a member of the African American race, were discriminated against by the Defendant because of their race, as provided under 42 U.S.C. §1981 and has suffered damages as set forth herein.

86. The Plaintiffs are African American individuals, identifies as such and is protected under Section 1981.

87. At all times relevant, the Plaintiffs were treated differently because of his race.

88. As a result of the Defendant's discrimination in violation of Section 1981, the Plaintiffs have been denied the enjoyment of all benefits, privileges, terms, and conditions of the Plaintiffs' contractual relationships, which provided substantial compensation and benefits, thereby entitling them to injunctive and equitable monetary relief; and having suffered such

anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of the Defendant's actions, thereby entitling the Plaintiffs to compensatory damages.

89. As alleged above, the Defendant acted with malice or reckless indifference to the rights of the Plaintiffz and copious other individuals named herein, thereby entitling the Plaintiffs to an award of punitive damages.

90. The Defendant committed the violations mentioned above and the Plaintiffs have suffered numerous damages as a result.

91. The Plaintiffs make a claim against the Defendant under all of the applicable paragraphs of 42 U.S.C. §1981.

92. The Plaintiffs claims the Defendant unlawfully discriminated against the Plaintiffs in violation of 42 U.S.C. §1981.

## COUNT TWO
*Race Discrimination (Hostile Work Environment)*
*in Violation of* § **1981**

93. The Plaintiffs reincorporate the factual allegations in the previous paragraphs 11-82.

94. This is an action for discrimination and harassment because of the Plaintiffs' race in violation of Section 1981. 42 U.S.C. §1981 states in relevant part as follows:

> (a) Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind,

12

and to no other. (b) "Make and enforce contracts" defined For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981.

95. Here, the Defendant's conduct occurred because of the Plaintiffs' legally protected characteristic; and was severe or pervasive enough to make a reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating, hostile or abusive.

96. The harassing conduct was directly connected to the Plaintiffs' race.

97. The Defendant's employees regularly harassed the Plaintiffs because of their race and their complaints of discrimination.

98. The Defendant's employees regularly made discriminatory comments about the Plaintiffs' on account of their race.

99. The Defendant's discriminatory conduct was not welcomed by the Plaintiffs.

100. As a result of the hostile work environment, the Plaintiffs suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

101. The Defendant failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race, failing to fully communicate the policy to its employees, and/ or failing to provide a

reasonable way for the Plaintiffs to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by the Plaintiffs.

102. As a result of the Defendant's violations of § 1981, the Plaintiffs have suffered damages, including, but not limited to: past and future lost wages, mental pain, and suffering; humiliation; emotional distress; diminishment of career opportunities; harm to business reputation; loss of self-esteem; disruption to his family life; and other harm, pain, and suffering, both tangible and intangible.

## COUNT THREE
### *Retaliation in Violation of § 1981*

103. The Plaintiffs reincorporate the factual allegations in the previous paragraphs 11-82.

104. The Plaintiffs complained of the discriminatory comments and conduct on multiple occasions, including but not limited to reports made to LAMB, CELVIN, FISHER.

105. In response to these complaints of race discrimination, Defendant retaliated against the Plaintiffs by subjecting them harsher and more strenuous work conditions, further escalating the discriminatory conduct targeted towards the plaintiffs, and unlawfully terminating the plaintiffs.

106. The retaliatory actions taken against Plaintiffs would deter a reasonable person from making or maintaining a complaint of discrimination and/or harassment against Defendant.

107. Plaintiffs have been damaged as a direct and proximate result of Defendant's illegal employment practices, including suffering economic damages, compensatory damages, emotional pain and suffering, inconvenience, mental anguish, outrage, loss of enjoyment of life, loss of dignity, and other non-pecuniary losses and tangible injuries.

## **COUNT FOUR**
### *FMLA Retaliation*
### *in Violation of 29 CFR § 825.220*

108.   The Plaintiffs reincorporate the factual allegations in the previous paragraphs 11-82.

109.   The FMLA prohibits employers from retaliating against an employee for "having exercised or attempted to exercise FMLA rights" and using "the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

110.   In or around July 2020, Plaintiffs were employed by the Defendant for at least twelve months. and had fulfilled more than 1,250 hours of service with the Defendant during that twelve month period. Accordingly, Plaintiffs were eligible employees under FMLA. 29 U.S.C. § 2611.

111.   In or around July 2020, Plaintiffs were entitled to FMLA leave, and Defendant was on notice of the Plaintiffs' entitlement to FMLA leave.

112.   In or around July 2020, Plaintiffs contracted COVID-19 which required testing and treatment at the hospital, followed by a regimen of continuing treatment thereafter. Defendant informed Plaintiffs to take leave until they were in receipt of a negative COVID test.

113.   On or about September 16, 2021, after Plaintiffs returned from FMLA leave, Defendant took a materially adverse action against Plaintiffs by terminating Plaintiffs' employment.

114.   Defendant's terminations of the Plaintiffs is a materially adverse action because any reasonable employee in Plaintiffs' position would be dissuaded from making a charge of discrimination if the employee knew it would be unlawfully terminated.

115. Additionally, the circumstances surrounding the Plaintiffs' entitlement and use of FMLA leave and the Defendant's retaliatory conduct are sufficiently close in temporal proximity to establish a causal connection.

116. Therefore, Defendant retaliated against the Plaintiffs for asserting their rights under the FMLA.

117. As a result of Defendant's intentional discriminatory conduct Plaintiffs have suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiffs accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

118. Plaintiffs further request that their attorney's fees and costs be awarded as permitted by law.

## DEMAND FOR JURY TRIAL

The Plaintiffs request a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request this Court enter judgment against the Defendant for all damages suffered by the Plaintiffs, as applicable to each count, including economic damages, lost wages (back pay and front pay) and benefits, liquidated damages, statutory damages, compensatory damages, emotional distress damages, punitive damages, interest, attorney's fees and costs, disbursements of action, and any other remedies (monetary and/or equitable) allowable by law as a result of the Defendant's conduct in violation of 42 U.S.C. §1981, and FMLA.

Dated:  Miami, Florida
        October 4, 2021

**DEREK SMITH LAW GROUP, PLLC**
*Counsel for Plaintiff*

By: /s/ Tiffani-Ruth I. Brooks, Esq.
Tiffani-Ruth I. Brooks, Esq.
Derek Smith Law Group, PLLC
701 Brickell Ave, Suite 1310
Miami, FL 33131
Tel: (305) 946-1884
Fax: (305) 503-6741
Tiffani@dereksmithlaw.com