**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

KATIA BORGELLA and ANTHONY WILLIAMS,

     Plaintiffs,

v.

ROBINS & MORTON CORPORATION and
ROBINS & MORTON GROUP,

     Defendants,

_____

CASE NO.: 1:21-CV-22789-
JLK

*Plaintiff Demands a*
*Trial by Jury*

## PLAINTIFFS' SECONDED AMENDED COMPLAINT

Plaintiffs KATIA BORGELLA and ANTHONY WILLIAMS (hereinafter referred to individually as "**Plaintiff Borgella**" and "**Plaintiff Williams,**" or referred to collectively as "**Plaintiffs**"), by and through their undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendants ROBINS & MORTON CORPORATION and ROBINS & MORTON GROUP (hereinafter collectively referred to as "**Defendants**" and/or "**Robins & Morton**"), and alleges as follows:

## INTRODUCTION

1. This employment discrimination case is about a construction company who subjected its two African American employees to relentless racial discrimination, harassment, and retaliation.

2. Plaintiffs jointly bring this action pursuant to 42 U.S.C. § 1981 ("**Section 1981**") and 29 U.S.C. § 2612 ("**FMLA**").

3. Plaintiffs seek monetary relief to redress the Defendants' unlawful employment practices in violation of Section 1981 and FMLA.  Additionally, this action seeks to redress Defendants' deprivation of Plaintiffs' personal dignity and their civil right to pursue equal employment opportunities.

4. At bottom, Defendants are liable for subjecting Plaintiffs to a work environment rife with relentless race discrimination and retaliation.

## PARTIES

5. At all material times, the Plaintiffs, KATIA BORGELLA and ANTHONY WILLIAMS, identify as Black. Plaintiffs are residents of the State of Florida, in Miami-Dade County.

6. At all times material Defendant ROBINS & MORTON GROUP was/is a Delaware Partnership (EIN: 63-1076743) with its principal place of business located at 400 Shades Creek Parkway, Birmingham, Alabama 35209. Defendant Robins & Morton Group is a registered partnership with the State of Florida and regularly conducts business within this state.

7. At all times material Defendant ROBINS & MORTON CORPORATION was/is a Delaware Corporation (EIN: 63-1076742) with its principal place of business located at 400 Shades Creek Parkway, Birmingham, Alabama 35209. Defendant Robins & Morton Corporation is a registered foreign corporation with the State of Florida and regularly conducts business within this state.

8. At all times material to this action, Defendant Robins & Morton Group and Defendant Robins & Morton Corporation, were the Plaintiffs' joint and/or sole employer.

9. The exact number of employees at the above entity/entities is unknown, but upon information and belief, the Defendants employed more than 50 employees within a 75-mile radius.

## JURISDICTION AND VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.  This action is authorized and instituted pursuant to 42 U.S.C. § 1981 and 29 U.S.C. § 2612.

11. Venue is proper in this Court under 28 U.S.C. §1391 because the unlawful employment practices alleged below were committed within the jurisdiction of the United States District Court for the Southern District of Florida.  The Defendants' business was and is still located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## STATEMENT OF MATERIAL FACTS

### [Plaintiff Borgella's Employment with Defendants]

12. In or around January 2019, Plaintiff Borgella began working for Defendants as a Gatekeeper.

13. Throughout her employment with Defendants, Plaintiff Borgella was subjected to racially discriminatory comments and conduct. By means of example, Defendants' employees referred to Plaintiffs Borgella and other Black employees as "**NIGGAS**" and/or "**MY NIGGA**" on a daily basis.

14. At all material times, Plaintiff Borgella was qualified for her position based on her education and work experience.

15. At all material times, Defendants considered Plaintiff Borgella to be an exemplary employee.

16. In fact, Defendants were so satisfied with Plaintiff Borgella's work performance that she was promoted in 2019 to the position of Labor Foremen. Despite her promotion, Plaintiff Borgella was never given the pay raise she was promised would be included in her promotion.

17. This kind of discriminatory treatment was not an isolated incident. Defendants regularly subjected Plaintiff Borgella to less favorable treatment than other similarly situated foremen, supervisors and managers working for Defendants.

18. One of Plaintiff Borgella's harassers was a co-worker known as Ms. MERLIN (Last Name Unknown) (hereinafter referred to as "**MERLIN**"). At all times relevant to this action, MERLIN identified as Hispanic.

19. By means of example, one on night in 2020, Plaintiff Borgella went into the restroom at work to clean the mop and bucket before completing her assigned cleaning duties. When Plaintiff Borgella walked out the restroom, MERLIN was waiting for her with a white rag in her hand. MERLIN thought Plaintiff Borgella had taken too long in the restroom and called her "**NIGGER BITCH**!".

20. Plaintiff Borgella became extremely upset in response to the discriminatory remark and began crying.

21. This incident was part of an ongoing pattern of racial discrimination. MERLIN regularly referred to Plaintiff Borgella as "**NIGGER**." MERLIN also frequently referred to Plaintiff Borgella as "**PACALO**", which was the name of another African American co-worker of Plaintiff Borgella. MERLIN did this to further taunt Plaintiff Borgella for her race.

22. Plaintiff Borgella went to report this conduct to one of Defendants' supervisors, Mr. CELVIN (Last Name Unknown) (hereinafter referred to as "**CELVIN**"). In response to the complaints of discrimination, CELVIN failed to take any corrective action, simply stating that "**Everyone knows MERLIN is racist**."

23. On another occasion, Plaintiff Borgella was working with MERLIN and two other women. Plaintiff Borgella went to gather the brooms and equipment for her assigned duties and when

she returned, MERLIN suggested that the work be divided by each employee's race: "**SPANISH WORK WITH SPANISH AND BLACKS WORK WITH BLACKS**." Plaintiff Borgella was appalled and embarrassed by the discriminatory remarks.

24. On that same evening, Plaintiff Borgella and Plaintiff Williams went to get on an elevator with MERLIN and another Hispanic co-worker. MERLIN then proceeds to tell the Hispanic co-worker "**NO, NO, NO, I DO NOT WANT TO RIDE WITH THEM**." MERLIN did not want to ride in the elevator with Plaintiffs Borgella and Williams because they were both African American.

25. Plaintiff Borgella again reported this conduct to CELVIN. CELVIN responded "**YOU KNOW HOW SHE IS**" and tried to divert the conversation by stating "**WE HAVE A LOT OF WORK TO DO**." Defendants again failed to take any form of corrective action.

26. Plaintiff Borgella also reported the discriminatory conduct to the Defendants' Senior Superintendent, Mr. RICK FISHER (hereinafter referred to as "**FISHER**"). In response, FISHER claimed to not have any knowledge of discriminatory comments or conduct and failed to take any corrective action.

27. On another evening in or around May 2020, Plaintiff Borgella and several other employees spoke with CELVIN and one of Defendants' Superintendents, Mr. ANTHONY LAMB (hereinafter referred to as "**LAMB**"), to review their assigned duties for the evening.

28. After leaving the meeting, Plaintiff Borgella went down to the elevator, where she ran into MERLIN. MERLIN then proceeded to call Plaintiff Borgella "**PUTA**," a Spanish slang term for "**BITCH**".

29. Plaintiff Borgella again reported the unlawful discrimination to CELVIN. CELVIN explained that he will be meeting with LAMB and both supervisors will discuss the issue further.

30. Later that evening Plaintiff Borgella and Plaintiff Williams join CELVIN and LAMB to explain the discrimination that they have been experiencing.

31. Rather than take any corrective action, CELVIN and LAMB stated that they were "**TIRED OF THE BACK AND FORTH**", referring to Plaintiff Borgella's complaint about the unlawful discrimination.

32. Shortly after making the reports of discrimination, the Defendants began assigning Plaintiff Borgella and Plaintiff Williams more difficult and strenuous work assignments. Plaintiff Borgella and Plaintiff Williams were also left without protective equipment on numerous occasions, while other non-African American employees were given protective equipment.

33. It was clear to Plaintiffs Borgella and Williams that these new work assignments and lack of safety equipment were actions taken by Defendants in retaliation for their complaints of discrimination.

### [Plaintiff Williams' Employment with Defendants]

34. In or around December 2018, Plaintiff Williams began working for Defendants as a Gatekeeper.

35. Similar to Plaintiff Borgella, Plaintiff Williams was subjected to racially discriminatory comments and conduct throughout his employment with the Defendants. By means of example, Defendants' employees referred to Plaintiff Williams as "**NIGGER**," "**BOY**," and/or "**PUSSY**" on a regular basis.

36. At all material times, Plaintiff Williams was qualified for his position based on his education and work experience.

37. At all material times, Defendants considered Plaintiff Williams to be an exemplary employee.

38. In fact, Defendants were so satisfied with Plaintiff Williams' work performance that he was eventually promoted to the position of Laborer.

39. Throughout his employment, Defendants' managers and employees made racially discriminatory comments to Plaintiff Williams such as "**WHAT'S UP MY NIGGER**?"

40. One of Defendants' Generally Foreman, Mr. FRANCO APPOINTE (hereinafter referred to as "**FRANCO**"), regularly harassed Plaintiff Williams on account of his race. FRANCO identified as Hispanic.

41. By means of example, FRANCO would constantly play rap music and specifically shout out the lyric/word "**NIGGER/NIGGA**" loudly while Plaintiff Williams was present. It became an everyday usage of the derogatory phrase when Franco would enter the lunchroom and saw Plaintiff Williams.

42. On other occasions, FRANCO's prejudice towards Plaintiff Williams' race was more obvious: "**HE [Plaintiff Williams] DOESN'T HAVE A PHONE, BUT YOU CAN CALL HIM ON HIS SECTION 8 HOUSING PHONE**".

43. Plaintiff Williams did not have any form of Section 8 Housing. FRANCO made this comment simply to humiliate Plaintiff Williams for the fact that he shared a cell phone with his girlfriend.

44. When FRANCO wanted to get the attention of Plaintiff Williams, he would shout out "**HEY BOY**".

45. FRANCO would also regularly remind Plaintiff Williams and the other African Americans "**YA'LL WILL ALWAYS BE LABORERS CLEANING SHIT**".

46. On another occasion, Plaintiff Williams was putting up a fence with his other African American co-workers and noticed FRANCO and CELVIN in a golfcart laughing at their direction while appearing to take photos and record them.

47. Plaintiff Williams later discovered why FRANCO and CELVIN were laughing at him and other the African Americans. FRANCO and CELVIN had begun a group chat and sent out an edited photo of Plaintiff Williams and the other African Americans putting up the fence. The edited photo included police officers with their guns drawn behind Plaintiff Williams and the other African Americans yelling "**FREEZE!**", as if the African Americans were being arrested by the police.

48. Just like Plaintiff Borgella, Plaintiff Williams made numerous complaints to Defendants' supervisors, including FISHER, CELVIN, and LAMB.

49. Defendants failed to take any corrective action. This was unsurprising to Plaintiff Williams, as some of those very managers were the ones participating in the racial discrimination.

50. Plaintiff Williams and other African American employees were worked harder than other non-African American employees. After Plaintiff Williams made complaints about the unlawful discrimination, Defendants began to assign even more burdensome work assignments than they had done previously, as a means to retaliate against Plaintiff Williams.

51. By means of example, Plaintiff Williams would be given strenuous and heavy-duty tasks that were meant for a team of individuals to complete but would be forced to complete the work on his own in a short span of time.

52. Plaintiff Williams was tasked with cutting concrete slabs, conducting grout filling, installing door frames, bed grading, installing access panels, installing dry wall, installing guard rails, operating night shift machinery, cleaning up the job site, and other additional laborer tasks, all on his own.

53. Plaintiff Williams would ask multiple times for additional help or back up from FRANCO and CELVIN. In response, FRANCO AND CELVIN would simply ignore Plaintiff Williams requests. CELVIN would go so far as to even call Mr. Williams a "**PUSSY**" for requesting the help he needed.

54. Plaintiff Williams was also required to complete tasks that other non-African Americans were not required to complete. For example, on one occasion, FRANCO picked up Plaintiff Williams while intoxicated to conduct a job on FRANCO's Sister-In-Law's house. FRANCO instructed Plaintiff Williams to complete all of the work while FRANCO slept in the truck

55. On other occasions, FRANCO would demand that Plaintiff Williams take him to the liquor store so that FRANCO could drink alcohol on the job.

56. In further retaliation for his complaints, Plaintiff Williams was required to purchase his own safety gear, which included gloves, eyewear, drill, and other items, while the non-African Americans employees were provided with such equipment. Plaintiff Williams was never reimbursed for the equipment he was forced to purchase.

57. On numerous occasions, Mr. Williams complained to FRANCO and CELVIN, among others, concerning the dangerous and hazardous conditions in which he was forced to work in, to no avail.

### [Plaintiffs' Covid-19 Infections and Unlawful Terminations]

58. On or around July 15, 2020, Plaintiff Borgella and Plaintiff Williams both began experiencing symptoms of severe illness, including headaches, body aches, and loss of appetite.

59. Plaintiff Borgella and Plaintiff Williams informed CELVIN of their symptoms and requested to go see a doctor. CELVIN told both Plaintiffs to go get tested for COVID-19 at MD AMERICAN URGENT CARE, located at 301 NE 167th Street, N. Miami Beach, Florida 33152. Defendants required that the Plaintiffs use this medical provider because they gave same-day testing results.

60. The next day, Plaintiff Borgella and Plaintiff Williams went to the urgent care to get tested. Plaintiff Borgella and Plaintiff Williams paid for the tests out of pocket, which cost $100.00 per test.

61. The test results came back the same day and showed a negative result. Both Plaintiff Williams and Plaintiff Borgella believed the test results must have been incorrect because they both were extremely ill. Nonetheless, Defendants required that both Plaintiffs report for work at 6:00PM that same day.

62. Plaintiff Borgella and Plaintiff Williams' symptoms persisted. As such, Plaintiffs informed FRANCO AND CELVIN that they both needed to go to the emergency room.

63. Plaintiff Borgella and Plaintiff Williams both went to the emergency room for testing and treatment. At the emergency room, both Plaintiffs tested positive for COVID-19.

64. At this time, Plaintiff Borgella and Plaintiff Williams were both eligible employees and entitled to take leave under the FMLA.

65. Plaintiffs informed Defendants of the positive test results and requested that the Defendants allow them to take a leave of absence from work. In response, Defendants instructed both

Plaintiffs to quarantine for 14 days, and not to return to work until they received a negative test result.

66. Plaintiffs followed the Defendants' instructions precisely and stayed in contact with FRANCO and CELVIN via text message throughout this time. Plaintiffs even emailed the ROBINS & MORTON corporate offices to ensure that they were in compliance with Defendants' COVID-19 policies.

67. Defendants sent documents to the Plaintiffs which allowed them to return to work following the quarantine period and receipt of a negative test result.

68. During this time, Plaintiff Borgella and Plaintiff Williams were both extremely sick, experiencing fevers, coughing, shakes, and loss of appetite, among other symptoms. Both Plaintiffs lost several pounds as a result of their illnesses.

69. Plaintiff Borgella and Plaintiff Williams continued to follow Defendants' protocols until they received negative test results in September of 2020.

70. Plaintiffs then contacted FRANCO and CELVIN to advise them of the negative test results and to start work again.

71. Rather than allow the Plaintiffs to return to work as promised, the Defendants terminated Plaintiff Borgella and Plaintiff Williams on September 16, 2020.

72. The Defendants unlawfully terminated Plaintiff Borgella because of her race, in retaliation for taking FMLA leave, and in retaliation for complaining about the Defendants' unlawful discrimination.

73. Similarly, the Defendants unlawfully terminated Plaintiff Williams because of his race, in retaliation for taking FMLA leave, and in retaliation for complaining about the Defendants' unlawful discrimination.

74. Prior to the Plaintiffs' complaints about the unlawful discrimination, neither Plaintiff Borgella or Plaintiff Williams had been disciplined or counseled about their job performance.

75. The Defendants' solution to curing the ongoing harassment and discrimination issues was to unlawfully terminate Plaintiffs Borgella and Williams, in violation of Section 1981 and the FMLA.

**COUNT I**
**42 U.S.C. § 1981**
**Race Discrimination – Disparate Treatment**
**(Plaintiff Borgella as Against all Defendants)**

76. Plaintiff Borgella reincorporates the factual allegations in the previous paragraphs 12-75.

77. This is an action for discrimination and harassment because of Plaintiff Borgella's race in violation of Section 1981. 42 U.S.C. §1981 states in relevant part as follows:

> (a) Statement of equal rights
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
> (b) "Make and enforce contracts" defined
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981.

78. Plaintiff Borgella is an African American and is therefore, a protected class member.

79. The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

80. The Defendants subjected Plaintiff Borgella to discriminatory treatment on the basis of her race.

81. The Defendants targeted Plaintiff Borgella because she was African American. Plaintiff Borgella was treated less favorably than her similarly situated non-African American counterparts.

82. The Defendants' discriminatory treatment included, but was not limited to, using racial slurs against the Plaintiff, such as "**NIGGER BITCH**," assigning the Plaintiff more difficult and strenuous work assignments, requiring that the Plaintiff be segregated and complete work assignments with only other African Americans, not allowing the Plaintiff to use the same facilities and equipment as non-African American employees, and eventually unlawfully terminating the Plaintiff, despite her compliance with Defendants' COVID-19 policies.

83. As a result of the Defendants' disparate treatment, Plaintiff Borgella suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

84. The Defendants failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race, failing to fully communicate the policy to its employees, and/ or failing to provide a reasonable way for Plaintiff Borgella to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by the Plaintiff.

85. As a direct and proximate result of the Defendants' discriminatory conduct in violation of Section 1981, Plaintiff has suffered and will continue to suffer financial and economic damages

in the form of lost wages (front and back pay) and lost benefits.  Plaintiff Borgella has also

suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and

other intangible damages. Plaintiff Borgella accordingly demands lost economic damages, lost

wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and

compensatory damages.

86. The Defendants' actions were knowing, intentional, willful, malicious, and in reckless

disregard of Plaintiff Borgella's rights under Section 1981, warranting the imposition of

punitive damages in addition to compensatory damages.

87. The conduct of the Defendants deprived Plaintiff Borgella of her statutory rights

guaranteed under Section 1981.

**COUNT II**
**42 U.S.C. § 1981**
**Race Discrimination – Hostile Work Environment**
**(Plaintiff Borgella as Against all Defendants)**

103. Plaintiff Borgella reincorporate the factual allegations in the previous paragraphs 12-75.

104. This is an action for discrimination and harassment because of Plaintiff Borgella's race in

violation of Section 1981. 42 U.S.C. §1981 states in relevant part as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same

right in every State and Territory to make and enforce contracts, to sue, be

parties, give evidence, and to the full and equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white

citizens, and shall be subject to like punishment, pains, penalties, taxes,

licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes

the making, performance, modification, and termination of contracts, and

14

the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981.

105. Plaintiff Borgella is an African American and is therefore, a protected class member.

106. The Defendants regularly harassed Plaintiff Borgella because of her race, as evidenced by the use of numerous racial slurs, including but not limited to "**NIGGER**" and "**NIGGER BITCH**".

107. Further, Plaintiff Borgella was treated less favorably than her similarly situated non-African American counterparts.

108. The Defendants' discriminatory conduct was not welcomed by Plaintiff Borgella. On several occasions, Plaintiff Borgella complained to FISHER, LAMB, and CELVIN, among others, about the discriminatory treatment she was forced to endure.

109. The Defendants' discriminatory treatment was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating hostile or abusive.

88. The Defendants' severe and pervasive conduct included, but was not limited to, using racial slurs against the Plaintiff, such as "**NIGGER BITCH**," assigning the Plaintiff more difficult and strenuous work assignments, requiring that the Plaintiff be segregated and complete work assignments with only other African Americans, not allowing the Plaintiff to use the same facilities and equipment as non-African American employees, and eventually unlawfully terminating the Plaintiff, despite her compliance with Defendants' COVID-19 policies.

110. As a result of the hostile work environment, Plaintiff Borgella suffered a "tangible employment action" defined as a significant change in employment status, failure to promote,

reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

111. The Defendants failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race, failing to fully communicate the policy to its employees, and/ or failing to provide a reasonable way for Plaintiff Borgella to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by the Plaintiff.

112. As a direct and proximate result of the hostile work environment created by the Defendants, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits. Plaintiff Borgella has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff Borgella accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

113. The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff Borgella's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

114. The conduct of the Defendants deprived Plaintiff Borgella of her statutory rights guaranteed under Section 1981.

**<u>COUNT III</u>**
**<u>42 U.S.C. § 1981</u>**
**<u>Retaliation</u>**
**<u>(Plaintiff Borgella as Against all Defendants)</u>**

115. Plaintiff Borgella reincorporates the factual allegations in the previous paragraphs 12-75.

116. Plaintiff Borgella engaged in a protected activity when she opposed and reported the Defendants' unlawful discrimination.

117. Plaintiff Borgella complained of the discriminatory comments and conduct on multiple occasions, including but not limited to reports made to LAMB, CELVIN, FISHER.

118. In response to these complaints of race discrimination, the Defendants retaliated against Plaintiff Borgella by subjecting her to even harsher and more strenuous work conditions, further escalating the discriminatory conduct targeted towards Plaintiff Borgella, and eventually unlawfully terminating Plaintiff Borgella, despite her compliance with all of Defendants' COVID-19 policies.

119. The Defendants took the above-described materially adverse actions against Plaintiff Borgella because of her protected activities.

120. Any reasonable employee in Plaintiff Borgella's position would be dissuaded from reporting discrimination if they knew that they would be subjected to the kind of treatment Plaintiff Borgella was forced to endure.

121. As a direct and proximate result of the Defendants' retaliatory conduct in violation of Section 1981, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff Borgella has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff Borgella accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

122. The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Plaintiff Borgella's rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

123. The conduct of the Defendants deprived Plaintiff Borgella of her statutory rights guaranteed under Section 1981.

### COUNT IV
### 29 CFR § 825.220
### FMLA Retaliation
### (Plaintiff Borgella as Against all Defendants)

124.  Plaintiff Borgella reincorporate the factual allegations in the previous paragraphs 12-75.

125. The FMLA prohibits employers from retaliating against an employee for "having exercised or attempted to exercise FMLA rights" and using "the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

126. In or around July 2020, Plaintiff Borgella had been employed by the Defendants for at least twelve months and had fulfilled more than 1,250 hours of service with the Defendants during that twelve-month period. Accordingly, Plaintiff Borgella was an eligible employee under the FMLA. 29 U.S.C. § 2611.

127. In or around July 2020, Plaintiff Borgella was entitled to FMLA leave, and Defendants were on notice of the Plaintiff's entitlement to FMLA leave.

128. In or around July 2020, Plaintiff Borgella contracted COVID-19, which required testing and treatment at the hospital, followed by a regimen of continuing treatment thereafter. Defendants informed Plaintiff Borgella to take leave until she was in receipt of a negative COVID test.

129. On or about September 16, 2021, after Plaintiff Borgella returned from FMLA leave, Defendants took a materially adverse action against Plaintiff Borgella by terminating her employment.

130. Defendants' termination of Plaintiff Borgella was a materially adverse action because any reasonable employee in Plaintiff Borgella's position would be dissuaded from making a charge of discrimination if the employee knew they would be unlawfully terminated.

131. Additionally, the circumstances surrounding the Plaintiff's entitlement and use of FMLA leave, and the Defendants' retaliatory conduct, are sufficiently close in temporal proximity to establish a causal connection.

132. Therefore, Defendants retaliated against Plaintiff Borgella for asserting her rights under the FMLA.

133. As a result of Defendants' intentional retaliatory conduct, Plaintiff Borgella has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff Borgella accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

134. Plaintiff Borgella further requests that her attorney's fees and costs be awarded as permitted by law.

**COUNT V**
**42 U.S.C. § 1981**
**Race Discrimination – Disparate Treatment**
**(Plaintiff Williams as Against all Defendants)**

135. Plaintiff Williams reincorporates the factual allegations in the previous paragraphs 12-75.

136. This is an action for discrimination and harassment because of Plaintiff Williams' race in violation of Section 1981. 42 U.S.C. §1981 states in relevant part as follows:

> (a) Statement of equal rights
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981.

137. Plaintiff Williams is an African American and is therefore, a protected class member.

138. The elements of a prima facie case of disparate treatment are flexible and are tailored on a case-by-case basis to differing factual circumstances.

139. The Defendants subjected Plaintiff Williams to discriminatory treatment on the basis of his race.

140. The Defendants targeted Plaintiff Williams because he was African American. Plaintiff Williams was treated less favorably than his similarly situated non-African American counterparts.

141. The Defendants' discriminatory treatment  included, but was not limited to, using racial slurs against the Plaintiff, such as "**BOY**" and "**NIGGER**," assigning the Plaintiff more difficult and strenuous work assignments, forcing the Plaintiff to work while other employees slept and/or consumed alcohol on the job, humiliating the Plaintiff by taking photos of him and editing them to be racially derogatory, and eventually unlawfully terminating the Plaintiff, despite his compliance with Defendants' COVID-19 policies.

142. As a result of the Defendants' disparate treatment, Plaintiff Williams suffered a "tangible employment action" defined as a significant change in employment status, failure to promote,

reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

143. The Defendants failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race, failing to fully communicate the policy to its employees, and/ or failing to provide a reasonable way for Plaintiff Williams to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by the Plaintiff.

144. As a direct and proximate result of the Defendants' discriminatory conduct in violation of Section 1981, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff Williams has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff Williams accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

145. The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff Williams' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

146. The conduct of the Defendants deprived Plaintiff Williams of his statutory rights guaranteed under Section 1981.

**<u>COUNT VI</u>**
**<u>42 U.S.C. § 1981</u>**
**<u>Race Discrimination – Hostile Work Environment</u>**
**<u>(Plaintiff Williams as Against all Defendants)</u>**

147. Plaintiff Williams reincorporate the factual allegations in the previous paragraphs 12-75.

148. This is an action for discrimination and harassment because of Plaintiff Williams' race in violation of Section 1981. 42 U.S.C. §1981 states in relevant part as follows:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981.

149. Plaintiff Williams is an African American and is therefore, a protected class member.

150. The Defendants regularly harassed Plaintiff Williams because of his race, as evidenced by the use of numerous racial slurs, including but not limited to "**BOY**" and "**NIGGER**".

151. Further, Plaintiff Williams was treated less favorably than his similarly situated non-African American counterparts.

152. The Defendants' discriminatory conduct was not welcomed by Plaintiff Williams. On several occasions, Plaintiff Williams complained to FISHER, LAMB, and CELVIN, among others, about the discriminatory treatment he was forced to endure.

153. The Defendants' discriminatory treatment was severe or pervasive enough to make any reasonable person of the same legally protected class believe that the conditions of employment were altered, and that the working environment was intimidating hostile or abusive.

154. The Defendants' severe and pervasive conduct included, but was not limited to, using racial slurs against the Plaintiff, such as "**BOY**" and "**NIGGER**," assigning the Plaintiff more difficult and strenuous work assignments, forcing the Plaintiff to work while other employees slept and/or consumed alcohol on the job, humiliating the Plaintiff by taking photos of him and editing them to be racially derogatory, and eventually unlawfully terminating the Plaintiff, despite his compliance with Defendants' COVID-19 policies.

155. As a result of the hostile work environment, Plaintiff Williams suffered a "tangible employment action" defined as a significant change in employment status, failure to promote, reassignment with significantly different responsibilities, and/or a decision causing a significant change in benefits.

156. The Defendants failed to exercise reasonable care to prevent racial harassment in the workplace by failing to establish an explicit policy against harassment in the workplace on the basis of race, failing to fully communicate the policy to its employees, and/ or failing to provide a reasonable way for Plaintiff Williams to make a claim of harassment to higher management, and failing to take reasonable steps to promptly correct the harassing behavior raised by the Plaintiff.

157. As a direct and proximate result of the hostile work environment created by the Defendants, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff Williams has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff Williams accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

158. The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff Williams' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

159. The conduct of the Defendants deprived Plaintiff Williams of his statutory rights guaranteed under Section 1981.

**COUNT VII**
**42 U.S.C. § 1981**
**Retaliation**
**(Plaintiff Williams as Against all Defendants)**

160. Plaintiff Williams reincorporates the factual allegations in the previous paragraphs 12-75.

161. Plaintiff Williams engaged in a protected activity when he opposed and reported the Defendants' unlawful discrimination.

162. Plaintiff Williams complained of the discriminatory comments and conduct on multiple occasions, including but not limited to reports made to LAMB, CELVIN, FISHER.

163. In response to these complaints of race discrimination, Defendants retaliated against Plaintiff Williams by subjecting him to even harsher and more strenuous work conditions, forcing Plaintiff Williams to purchase his own safety gear while providing it to other non-African American employees, further escalating the discriminatory conduct targeted towards Plaintiff Williams, and eventually unlawfully terminating Plaintiff Williams, despite his compliance with all of Defendants' COVID-19 policies.

164. The Defendants took the above-described materially adverse actions against Plaintiff Williams because of his protected activities.

165. Any reasonable employee in Plaintiff Williams' position would be dissuaded from reporting discrimination if they knew that they would be subjected to the kind of treatment Plaintiff Williams was forced to endure.

166. As a direct and proximate result of the Defendants' retaliatory conduct in violation of Section 1981, Plaintiff has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff Williams has also suffered and will continue to suffer emotional distress, mental anguish, loss of dignity, and other intangible damages. Plaintiff Williams accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

167. The Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of the Plaintiff Williams' rights under Section 1981, warranting the imposition of punitive damages in addition to compensatory damages.

168. The conduct of the Defendants deprived Plaintiff Williams of his statutory rights guaranteed under Section 1981.

**COUNT VIII**
**29 CFR § 825.220**
**FMLA Retaliation**
**(Plaintiff Williams as Against all Defendants)**

169. Plaintiff Williams reincorporate the factual allegations in the previous paragraphs 12-75.

170. The FMLA prohibits employers from retaliating against an employee for "having exercised or attempted to exercise FMLA rights" and using "the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

171. In or around July 2020, Plaintiff Williams had been employed by the Defendants for at least twelve months and had fulfilled more than 1,250 hours of service with the Defendants during that twelve-month period. Accordingly, Plaintiff Williams was an eligible employee under FMLA. 29 U.S.C. § 2611.

172. In or around July 2020, Plaintiff Williams was entitled to FMLA leave, and Defendants were on notice of the Plaintiff's entitlement to FMLA leave.

173. In or around July 2020, Plaintiff Williams contracted COVID-19, which required testing and treatment at the hospital, followed by a regimen of continuing treatment thereafter. Defendants informed Plaintiff Williams to take leave until they were in receipt of a negative COVID test.

174. On or about September 16, 2021, after Plaintiff Williams returned from FMLA leave, Defendants took a materially adverse action against Plaintiff Williams by terminating his employment.

175. Defendants' termination of the Plaintiff Williams is a materially adverse action because any reasonable employee in Plaintiff Williams' position would be dissuaded from making a charge of discrimination if the employee knew they would be unlawfully terminated.

176. Additionally, the circumstances surrounding the Plaintiff's entitlement and use of FMLA leave, and the Defendants' retaliatory conduct, are sufficiently close in temporal proximity to establish a causal connection.

177. Therefore, Defendants retaliated against Plaintiff Williams for asserting his rights under the FMLA.

178. As a result of Defendants' intentional retaliatory conduct Plaintiff Williams has suffered and will continue to suffer financial and economic damages in the form of lost wages (front and back pay) and lost benefits.  Plaintiff Williams accordingly demands lost economic damages, lost wages, back pay, interest, front pay, the value and/or economic impact of lost benefits, and compensatory damages.

179. Plaintiff Williams further request that his attorney's fees and costs be awarded as permitted by law.

## DEMAND FOR JURY TRIAL

The Plaintiffs request a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request this Court enter judgment against the

Defendants for all damages suffered by the Plaintiffs, including interest, attorney's fees and costs,

disbursements of action, and any other monetary or equitable relief allowable by law as a result of

the Defendants' conduct in violation of 42 U.S.C. §1981 and the FMLA.


Dated:  Miami, Florida
         January 27, 2022,

                                          **DEREK SMITH LAW GROUP, PLLC**
                                          *Counsel for Plaintiffs*

                                          By: s/ Caroline H. Miller, Esq
                                          Caroline H. Miller, Esq.
                                          Derek Smith Law Group, PLLC
                                          701 Brickell Ave, Suite 1310
                                          Miami, FL 33131
                                          Tel: (305) 946-1884
                                          Fax: (305) 503-6741
                                          Caroline@dereksmithlaw.com


*[Certificate of service on the following page]*

27

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document is being

served on January 27, 2022, on all counsel of record on the service list below via transmission of

Notices of Electronic Filing generated by CM/ECF.

By: *s/ Caroline H. Miller*
Caroline H. Miller, Esq.